UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

PATRICK J SENN,

        Plaintiff,

  v.                                      Case No. 12-C-326

MICHAEL ASTRUE,

        Defendant.

**DECISION AND ORDER**

This is an action for review of the final decision of the Commissioner of Social Security denying Plaintiff's application for Supplemental Security Income (SSI) and Disability Insurance Benefits (DIB) under Titles II and XVI of the Social Security Act. 42 U.S.C. §§ 401 et seq. For the reasons stated in this opinion, the Commissioner's decision will be remanded.

**BACKGROUND**

Plaintiff Patrick Senn filed an application for SSI and DIB on January 25, 2010. Senn alleged a disability onset date of September 1, 2006. Senn previously filed an application for benefits in October 2008, which was subsequently denied January 12, 2009. Senn did not appeal the agency decision for his previous application. The ALJ concluded that the doctrine of res judicata barred Senn's claim for benefits prior to the date of the earlier denial, and Senn does not challenge this conclusion. Senn's current applications are thus for disability and SSI benefits to which he claims he is entitled after January 12, 2009. (Tr. 73-74.)

Senn's allegations of disability primarily stemmed from his chronic back pain for which he was treated at the Gunderson Clinic in LaCrosse in the early 1990s. He underwent two discectomies at the L4-5 level of the spine, the first in December 1991 and the second in September 1992. (Tr. 400.) Senn initially recovered well from these surgeries, but his symptoms quickly returned in each case. Symptoms reappeared in January 1993 after the second surgery. Senn's doctor thought that if further surgery was indicated he would need a spinal fusion, but at that point it was too early to consider a fusion. (*Id.*) He was referred for pain management and was prescribed Ibuprofin and physical therapy which gave him some relief. Senn discontinued treatment in June 1993. The notes state that he agreed with his doctor at that time that no further treatment was needed. Senn had found that aspirin and Tylenol gave him the most pain relief, and he had accepted the fact that he would have some persistent pain with good days and bad days. (Tr. 407.) He was seen again the following year on October 19, 1994, for a pre-employment physical. He reported his pain was tolerable, he was no longer taking any medication for it, and it did not hamper his activity. The note listed an impression of "mild radicular chronic pain which is not limiting at the present time." (*Id.*)

The record reveals no further medical treatment until September 2008 when Senn was seen at the Fox Cities Community Health Clinic in Menasha with a report of "chronic pain: sciatic and right leg pain." (Tr. 192.) Senn described his history of back surgeries from more than fifteen years earlier and reported he had used aspirin to assist with the pain throughout the years. He explained that a recent job loss "brought significant stress to the situation since he was unable to find another job that requires minimal physical labor." (*Id.*) X-rays were ordered and a report noted "disk spaces are maintained although endplate irregularity and osteophytes are present at

2

several levels indicative of disk degeneration, most severe at the 2-3 level." (Tr. 189.) The report also noted sclerosis and hypertrophic change posteriorly on the right at the L5 level, which could relate to facet disease or pars defect. The overall impression was "mild disk degeneration in the low thoracic spine. (*Id.*)

Senn returned to the Clinic two weeks later for a follow-up visit and was seen by Dr. Jan Sarnecki. Dr. Sarnecki noted the X-ray showed evidence of "degenerative changes to a significant degree." (Tr. 198.) She offered a diagnosis of degenerative arthritis of the lumbar spine and probable recurrence of either disc or scar tissue formation or some degree of spinal stenosis post disc excision at L4-5. (*Id.*) Dr. Sarnecki suggested trying to find pain medications that would help him or trying an epidural steroid injection at L4-5, which had apparently helped him in the past. (*Id.*) Dr. Sarnecki noted Senn was also applying for social security disability because he cannot find work as a result of his age and recurrent back problems. She added: "I think he is basically unemployable." (*Id.*)

The record reveals no further follow up at the Clinic until June of 2010 when Senn was seen for a large ganglion cyst on his left wrist. (Tr. 225.) He was given a referral for a free consultation with a hand specialist. (Tr. 228.) He was again seen at the clinic on January 27, 2011, as a follow-up for an injury to his back he sustained the previous week while shoveling snow. (Tr. 223.) He was first seen for that injury at the emergency room at Theda Clark Hospital on January 19, 2011. (Tr. 233-34.)

Senn saw Dr. Ward Jankus, a state consultative physician, in February 2010. Senn complained of lower back pain on a daily basis, rating it a "5 or 6" level on average. He said he always had some degree of pain of a deep, aching nature that is from his back all the way down

3

through his right leg into his foot. Sometimes there would also be numbing or tingling in his leg. Recent X-rays showed some degenerative changes in the lower back but were essentially unremarkable. (Tr. 200.) Senn reported some knee pain caused by tibial terbucles when he would kneel, crouch or squat. In response to Dr. Jankus' questions, Senn estimated that he could walk about 4 or 5 blocks before his right leg would start to bother him, and that he could stand for maybe two hours if he could move around, but would then need a 30-minute break. When asked to estimate how long he could be on his feet in an eight-hour day, Senn responded that "it was really hard to say because he is just not pushing himself these days." (Tr. 201.)

On physical examination, forward flexion was 70 degrees, bringing fingertips 8 to 10 inches from the floor. He could extend 20 degrees and bend bilaterally 30 degrees, all with some increasing pain complaints at the end range. Dr. Jankus noted no tenderness with light to moderate palpation to lower back but no spasm. (Tr. 201.) Upper and lower extremities were 5/5, and upper and lower calves were of roughly equal measurement indicating no asymmetric disuse issues or nerve root damage. Senn's gait seemed normal and no limping was noted. Senn was able to get on and off the examination table by himself and had no difficulty with grasping or manipulating. (Tr. 202.) Dr. Jankus' impression was: (1) chronic mechanical lower back pain presumably secondary to degenerative changes; (2) right leg radiation highly suggestive of nerve root irritation, although there was no clear asymmetric nerve root damage on exam; (3) prominent tibial tubercles with difficulty tolerating kneeling and crawling activities; and (4) left wrist small ganglion cyst. (Tr. 202-3.)

State reviewing physician, Dr. Chan reviewed the available medical record on March 5, 2010, and determined in his physical residual functional capacity (RFC) assessment that Senn could

4

occasionally lift 20 pounds, frequently lift 10 pounds, and could stand and walk for about six hours in an eight-hour workday. Dr. Chan concluded that Senn had a physical RFC to perform light work limited to occasional kneeling, squatting, and crawling due to knee pain. State reviewing physician, Dr. Khorshidi, whose opinion the ALJ gave significant weight, opined on April 29, 2010, that Senn had greater physical abilities than Dr. Chan found. Dr. Khorshidi concluded that Senn could perform medium work.

At the hearing held on August 4, 2011, Senn explained that the absence of substantial and more recent treatment records for his alleged back pain was due to his lack of insurance. (Tr. 48-49.) He also testified that he was in pain "all of the time", and that on a scale of one to ten, his average level of pain was a "nine." (Tr. 49.) He explained that he did not take medication for his back pain because he had taken so much in the past that he was immune to its effects, and that it generally upset him. He did take aspirin for headaches, however. (*Id.*)

The ALJ determined that Senn suffered from the following severe impairments: mild degenerative disc disease of the lumbar spine, a small ganglion cyst on the left wrist, and prominent tibial tubercles. (Tr. 74.) The ALJ concluded that Senn's aliments singly or in combination did not meet a listing and that he had a physical RFC to perform medium work. (Tr. 74-75.) The ALJ found that Senn could lift and carry 50 pounds occasionally and 25 pounds frequently, could stand for 6 hours and sit for 6 hours out of an eight-hour workday. (*Id.*) The ALJ then found that Senn was capable of performing his past work as a painter or assembler and thus was not disabled. (Tr. 78.) In addition, the ALJ alternatively found that even if Senn could not return to his previous work, there were other jobs, such as hand packer or custodian, that existed in significant numbers that Senn could perform within his physical RFC. (Tr. 79-80.)

5

In reaching his decision, the ALJ placed primary weight on the conclusions of reviewing physician Dr. Khorshidi and consultative examiner Dr. Jankus and placed little weight on the opinions of reviewing physician Dr. Chan and treating physician Dr. Sarnecki. The ALJ also did not find Senn credible primarily because his "lack of treatment is inconsistent with the medical response that would be expected if the claimant had symptoms and limitations as severe as reported by the claimant." (Tr. 78.) In addition, the ALJ cited Senn's reported daily activities as inconsistent with someone who had disabling back pain.

The ALJ rendered his opinion denying Senn's application on September 20, 2011. Senn requested a review of the ALJ's decision to the Appeals Counsel. Senn's request was denied on February 16, 2012, making the ALJ's decision the final decision of the Commissioner.

**STANDARD OF REVIEW**

An ALJ's conclusion of no disability is reviewed with deference and will be upheld if it is supported by substantial evidence. Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Schaaf v. Astrue*, 602 F.3d 869, 874 (7th Cir. 2010) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). The court reviews the entire record but does not substitute its judgment for that of the Commissioner by reconsidering facts, reweighing evidence, resolving conflicts in evidence, or deciding questions of credibility. *Estok v. Apfel*, 152 F.3d 636, 638 (7th Cir. 1998). An ALJ need not specifically address every piece of evidence, but must provide a "logical bridge" between the evidence and her conclusions. *O'Connor–Spinner v. Astrue*, 627 F.3d 614, 618 (7th Cir. 2010) (citing *Getch v. Astrue*, 539 F.3d 473, 480 (7th Cir. 2008)). An ALJ must also "confront evidence that does not support his

6

conclusion and explain why it was rejected." *Kasarsky v. Barnhart*, 335 F.3d 539, 543 (7th Cir. 2003). An ALJ's credibility determination is entitled to special deference because the ALJ has the opportunity to observe the claimant testifying. *Castile v. Astrue*, 617 F.3d 923, 928-29 (7th Cir. 2010). Accordingly, credibility determinations are reversed only if they are patently wrong. *Id.* The ALJ is also expected to follow the Agency's own rulings and regulations in making his determination. Failure to do so, unless the error is harmless, also requires reversal. *Prochaska v. Barnhart*, 454 F.3d 731, 736-37 (7th Cir. 2006).

## ANALYSIS

**A. Credibility**

Senn argues that the ALJ's credibility determination was flawed in several different ways. Senn maintains that the ALJ relied on meaningless boilerplate in support of his credibility determination without supplying a logical bridge between the evidence and his conclusions. *Bjornson v. Astrue*, 671 F.3d 640, 645 (7th Cir. 2012) (stating that boilerplate language is not sufficient to inform the court in a meaningful reviewable way "the specific evidence the ALJ considered in determining that claimant's complaints were not credible" (quoting *Hardman v. Barnhart*, 362 F.3d 676, 679 (10th Cir. 2004))). It is apparent, however, upon a review of the ALJ's opinion, that he outlined several reasons for reaching his credibility determination, apart from the boilerplate language.

The ALJ noted that he did not find Senn's statements of pain credible primarily for the following reason:

7

> [T]he claimant has very limited medical evidence for review. The medical evidence that is on file shows a significant gap in medical care services and very little follow up. This lack of treatment is inconsistent with the medical response that would be expected if the claimant had symptoms and limitations as severe as reported by the claimant. Furthermore, the claimant failed to pursue health care consistent with the degree of disability asserted during the adjudicative time period considered. These findings, and lack of treatment, are inconsistent with the claimant's testimony and lessen his credibility.

(Tr. 78.) In addition, the ALJ cited Senn's reported daily activities as revealing "a person capable of performing substantial gainful activities." (*Id.*) Senn reported that he does dishes, mows the lawn, cleans and does laundry, drives a car, watches television, and can manage his own funds. The ALJ explained that this "sort of activity reveals a claimant who is not in continuous pain, nor incapable of work." (*Id.*)

First, Senn contends that the ALJ erred because he did not take into account his statements that he was not able to obtain treatment due to a lack of insurance. SSR 96-7p cautions the ALJ about drawing adverse inferences from a lack of treatment without first taking into account a claimant's explanation such as lack of access to free or low-cost medical services. But as the Commissioner points out, Senn did not lack complete access to medical services. He saw Dr. Sarnecki twice in September 2008, and in June 2010, the Fox Cities Community Health Center referred him to a physician or nurse practitioner for an evaluation of the ganglion cyst on his left wrist. The cover letter from the Community Health Center asked the provider to discount the fees owed to the Medicaid rate for patients like Senn and stated that the Center would pay the first reduced consult fee, thereby indicating that some medical care was available even without insurance. He also sought medical attention at the Theda Clark Medical Center emergency room in January 2011, after he experienced pain while shoveling snow, and sought follow-up care at the

8

Community clinic. Thus, despite the absence of insurance, Senn did have some access to medical care. Based on this evidence, the ALJ was justified in concluding that if Senn's pain was as frequent ("all the time") and as severe ("on a scale of one to ten my average day is about a nine") as he claimed in his testimony, his medical record would have been more extensive even though he did not have health insurance.

The ALJ was also not required to accept Senn's additional and inconsistent explanations for why he was not taking any medication. Senn testified that he did not take any pain medication (other than aspirin for headaches) because he had become immune to the effects of "most anything" as a result of the amounts he had taken earlier and because "medication generally upsets me." (Tr. 49.) Yet, if Senn was immune to the effects of pain medication in general or was otherwise unable to take it, one would expect this fact to be reflected somewhere in his medical records. The records indicate at most, past problems with excessive use of Iburprofen and a reaction to codeine. (Tr. 401, 403.) In fact, the records indicate he was prescribed pain medication both by Dr. Sarnecki at the Fox Cities Community Health Clinic and the hospital emergency staff at his most recent visits. (Tr. 198, 234.)

Senn also attacks the ALJ's reliance on his report of daily activities as a reason for discrediting his testimony. He argues that his daily activities are not inconsistent with the limitations he claims. But while Senn's daily activities may not establish he can perform work at the medium level, it was not unreasonable for the ALJ to conclude that those activities were inconsistent with Senn's testimony that he was in pain "all the time" and that his average day was about a nine. Particularly, the activity of mowing the lawn would seem strenuous for a person whose back pain averages a nine each day. Although Senn suggests mowing the lawn involves

9

simply walking behind the mower (Tr. 50), this fails to take into account the frequent need to turn the mower around at boundary lines and to avoid obstructions. Even the tasks of washing dishes for the family he was living with and doing laundry on a regular basis would seem unlikely for a person in constant and severe pain. While these activities many not establish that Senn could perform the complete range of medium work, they were sufficient to allow the ALJ to conclude that Senn's statements concerning the frequency and severity of his pain lacked credibility.

Senn also argues that even if the record contains evidence that supports the ALJ's findings, the Commissioner is foreclosed from relying on any evidence or argument that the ALJ did not explicitly set forth in his written decision. He argues that the Agency's own rules require the ALJ to consider a claimant's lack of insurance before drawing adverse inferences from the absence of treatment records. The ALJ's failure to address the issue in his written decision requires reversal, Senn suggests, regardless of whether there is evidence in the record that otherwise supports the conclusion that the lack of insurance is not an adequate explanation for Senn's failure to seek treatment or use pain medication.

But while the Agency's rules require that lack of access to free or low-cost medical services be considered, an ALJ is not required to address in writing every piece of evidence or testimony presented. *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008). The ALJ must provide an "'accurate and logical bridge' between the evidence and the conclusion that the claimant is not disabled, so that as a reviewing court may assess the validity of the agency's ultimate findings and afford [the] claimant meaningful judicial review." *Id.* (quoting *Young v. Barnhart*, 362 F.3d 995, 1002 (7th Cir. 2004). SSR 96-7p states:

10

> The determination or decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight. This documentation is necessary in order to give the individual a full and fair review of his or her claim, and in order to ensure a well-reasoned determination or decision.

SSR 96-7p, 1996 WL 374186, *4 (S.S.A.). Here, the ALJ provided specific reasons for his finding on credibility. While it could have been more detailed, it is sufficiently specific to make clear the weight that was given to Senn's testimony and the reasons for that weight.

Senn next argues that, to the extent the Commissioner offers a rationale or cites evidence to support the ALJ's decision that was not specifically set forth in the ALJ's written decision, he runs afoul of *SEC v. Chenery Corp.*, 318 U.S. 80, 87-88 (1943). This argument does have some merit. The Seventh Circuit has held that under what it calls the *Chenery* doctrine, the Commissioner is precluded from relying on evidence or a rationale for upholding the ALJ's decision that does not appear in the ALJ's decision. *See, e.g., Roddy v. Astrue*, ___ F.3d ____, 2013 WL 197924, *6 (7th Cir. Jan. 18, 2013) ("But the Commissioner cannot defend the ALJ's decision using this rationale directly, or by invoking an overly broad conception of harmless error, because the ALJ did not employ the rationale in his opinion." (citing *Chenery*)); *Campbell v. Astrue*, 627 F.3d 299, 307 (7th Cir. 2010) ("In doing so, the Commissioner advances a ground on which the ALJ did not rely, in violation of the *Chenery* doctrine."); *Larson v. Astrue*, 615 F.3d 744, 749 (7th Cir. 2010) ("But these are not reasons that appear in the ALJ's opinion, and thus they cannot be used here." (citing *Chenery*); *Parker v. Astrue*, 597 F.3d 920, 925 (7th Cir. 2010) ("Again violating the *Chenery* doctrine, as in Parker's case, the brief for the Social Security Administration points to

11

evidence, not mentioned by the administrative law judge, by a psychiatrist who thought that the plaintiff's condition was not disabling.").

The actual holding of *Chenery* does not support such a broad rule. *Chenery* itself involved the review of an order of the Securities and Exchange Commission. A group of officers and directors of a public utility holding company, pending reorganization, had purchased preferred stock for the purpose of protecting their interest in the company. Although there was no rule or law prohibiting such purchases, the SEC rejected the reorganization plan unless it was amended so that the preferred stock purchased by the officers and directors while the reorganization plan was pending would not be converted into the common stock of the new company as provided by the plan. Applying broad equitable principles applicable in all cases, the Commission concluded that "the 'duty of fair dealing' which management owes to the stockholders is violated if those in control of the corporation purchase its stock, even at a fair price, openly and without fraud." 318 U.S. at 87. On appeal, the Commission conceded that "courts do not impose upon officers and directors of a corporation any fiduciary duty to its stockholders which precludes them, merely because they are officers and directors, from buying and selling the corporation's stock," and thus its decision could not stand on the general principles of equity upon which it had relied. *Id.* at 88. Instead, the Commission argued that its decision should be upheld because a general rule prohibiting management from purchasing stock under such circumstances would be reasonable in light of the effect that the timing and dynamics of reorganization can have on the fairness of individual stock transactions and the role of management in calling for reorganization. *Id.* at 90.

It was in this context that the Supreme Court enunciated what has come to be called the *Chenery* Doctrine. The Court noted that the grounds upon which the Commission urged affirmance

12

of its decision were not those upon which its action was based. The Commission had not enacted a rule prohibiting management from purchasing stock of a company while reorganization was pending based upon "its special administrative competence." *Id.* at 90. Had it done so, the Court observed, "the problem for our consideration would be very different." *Id.* Instead, the Commission was asking the Court to adopt such a rule and affirm its order on that basis. For it to do so, the Court suggested, would be to "intrude upon the domain which Congress has exclusively entrusted to an administrative agency." *Id.* at 88. In other words, the Court's refusal to affirm the Commission's order based on a rule it had yet to enact was out of deference to the Commission's authority, delegated to it by Congress:

> In finding that the Commission's order cannot be sustained, we are not imposing any trammels on its powers. We are not enforcing formal requirements. We are not suggesting that the Commission must justify its exercise of administrative discretion in any particular manner or with artistic refinement. We are not sticking in the bark of words. We merely hold that an administrative order cannot be upheld unless the grounds upon which the agency acted in exercising its powers were those upon which its action can be sustained.

*Id.* at 95. The Court therefore remanded the case to the Commission for further proceedings.

*Chenery*, on its face, would seem to have little application here. In this case, there is no suggestion that the Commissioner is attempting to change the grounds upon which the ALJ denied Senn's application for disability insurance benefits. The ALJ concluded that Senn was not disabled because Senn was capable of performing medium work and could thus return to his previous work as a painter or assembler, or perform other jobs in the national economy. (Tr. 78-79.) It is on these same grounds that the Commissioner requests that the Agency's decision be affirmed. It is true that in response to Senn's arguments that the ALJ's decision is not supported by substantial evidence,

13

the Commissioner has directed the court's attention to evidence in the record that was not explicitly referenced by the ALJ in his written decision. But this is not a violation of the actual holding in *Chenery*. Citing evidence not mentioned by the ALJ to support findings the ALJ actually made is not the same as defending the ALJ's decision on grounds the ALJ did not offer or on which he or she did not rely. And it is a far cry from asking the court to adopt a policy or enact a rule on a matter Congress has exclusively entrusted to the agency.

The standard of review in a social security case is whether the decision is supported by substantial evidence in the record, not whether the ALJ has recounted each item of evidence contained in the record that supports his factual findings or addressed every argument the claimant later raises on review. To require ALJs to anticipate each argument a claimant may raise on appeal and include in their written decisions an explanation for their rejection of it, along with a citation to each item of evidence that supports their findings, would impose on ALJs a standard of articulation far beyond what is expected of judges or juries in any other kind of case, even criminal cases. It would also seem to deprive the agency of the deference it is traditionally owed by courts undertaking judicial review. Yet, that is what seems to be required under the *Chenery* doctrine as it has come to be applied in social security cases. Certainly, the language of some of the cases cited by Senn provides support for this view. Such a broad application of the doctrine may in part explain the large proportion of reversals in social security cases in this district. *See Friedland v. Astrue*, Case No. 12-CV-114-JPS, (E.D. Wis. Jan 31, 2013) (compiling statistics and noting that between 2009 and 2012, 71-84% of social security cases were reversed and remanded).

This is an area of law in which some guidance by the appellate courts might be helpful. Applying the *Chenery* doctrine so as to preclude attorneys for the Commissioner from citing

14

evidence or offering a rationale in their argument for affirming the Agency's decision that was not included in the ALJ's decision would seem to run afoul of the broader body of law which holds that the ALJ need not address every item of evidence and must only provide a "logical bridge" between the evidence and the conclusion that the claimant is not disabled, so that a reviewing court can assess the validity of the agency's ultimate findings and afford the claimant meaningful judicial review. *Young v. Barnhart*, 362 F.3d 995, 1002 (7th Cir. 2004). This is not to say that an ALJ can simply write "benefits denied" as his decision and then rely upon the Commissioner's attorneys to construct the underlying rationale. *See Spiva v. Astrue*, 628 F.3d 346, 353 (7th Cir. 2010). The decision "must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." SSR 96-7p, 1996 WL 374186, *4. What needs clarification is the degree of specificity and detail that the ALJ's decision must contain. If, as a strict application of the *Chenery* doctrine would seem to require, all arguments must be anticipated and addressed by the ALJ and all of the evidence supporting his or her findings must be specifically referenced, the Court of Appeals should say so.

Here, the ALJ made clear that he did not believe Senn's testimony as to the frequency and severity of his pain because he had not sought treatment or taken medication stronger than aspirin, despite his claim that he was in constant pain and that the level of pain averaged a nine out of ten on a daily basis. The ALJ did not address in his written decision, however, Senn's testimony that he did not have insurance. The ALJ also failed to explain in detail which of the daily activities Senn described were inconsistent with his complaints and why. While it is also true, as the

15

Commissioner points out that Senn had some access to free or low-cost insurance, the ALJ did not offer this evidence or analysis to support his decision. Under the *Chenery* doctrine as applied at least in this circuit, this is insufficient. The case must therefore be remanded.

**B. Residual Functional Capacity**

The ALJ found that Senn was capable of medium work with no restrictions. In support of this finding the ALJ assigned great weight to the medical opinions of Dr. Khorshidi and Dr. Jankus. But while Dr. Khorshidi's assessment supports the ALJ's finding that Senn was capable of medium work with no limitations, Dr. Jankus' does not.

Dr. Jankus, who, unlike Dr. Khorshidi, was asked to actually examine Senn rather than simply review his medical record, provided a somewhat vague estimate of Senn's functional capacity. He provided no opinion as to how much weight Senn could carry, noting only that he asked Senn how much he thought he could lift and carry around "without flaring up his different bone and joint issues" and that Senn "thought maybe 15 to 20." (Tr. 201.) As to his ability to remain on his feet during the workday, Dr. Jankus noted:

> Total weightbearing out of an 8 hour period is very hard to assess as the claimant himself is uncertain what he might be able to do these days seeing as he is not really pushing himself. In general he estimates he can be up maybe a couple of hours doing some activities and then he needs about a 30 minute rest. Perhaps something in that range might be pretty reasonable in his case based on the mechanical back pain issues although hard to be more precise. He does mention at times he will get more significant flare-ups if he just happens to bend or twist or turn or reach in a certain position and I do not doubt that he does have those intermittent flare-ups which can be unpredictable.

(Tr. 203.)

From the foregoing, it appears that Dr. Jankus thought Senn would be unable to be on his feet for long periods of time without a substantial break. Dr. Jankus also thought that Senn would have significant, intermittent and unpredictable flare-ups of back pain brought on by bending, twisting, turning or reaching. Although the ALJ indicated he "assigned great weight" to Dr. Jankus' opinion, the report of Dr. Jankus cannot be reasonably read as support for the finding that Senn was capable of lifting 50 pounds occasionally or standing for six hours in an eight-hour work day on a continuous basis. The ALJ neither addressed the limitations set forth in Dr. Jankus' report, nor did he include them in his RFC. Given the fact that Dr. Jankus, unlike Dr. Khorshidi actually examined Senn, some discussion of the limitations noted by Dr. Jankus is required in order for the court to follow the follow the logical bridge that the ALJ is required to build between the evidence and his conclusion. This is especially true since the ALJ noted he gave great weight to Dr. Jankus' opinion.

The issue raised is significant since the limitations set forth in Dr. Jankus' report may preclude Senn from being able to undertake work at the medium level of exertion and even the full range of light work. Because of his age, incapacity to perform the full range of light work would mandate a finding of disabled under the Medical-Vocational guidelines. 20 C.F.R. § 404, Subpart P, Appendix 2, § 202.06. Moreover, Dr. Jankus' view that Senn had significant functional limitations was shared by Dr. Sarnecki, who saw Senn at the Community Clinic and opined that he was "basically unemployable." (Tr. 197.) The other reviewing State Agency consultant, Dr. Chan, also thought Senn capable only of light work with limitations. In light of this additional evidence, the ALJ's failure to more fully address Dr. Jankus' leaves a significant gap. The case must therefore be remanded.

17

## CONCLUSION

For the reasons given above, the decision of the Commissioner is **REMANDED** pursuant to 42 U.S.C. § 405(g) (sentence four) for proceedings consistent with this opinion.

**SO ORDERED** this   20th   day of February, 2013.

 s/ William C. Griesbach
William C. Griesbach, Chief Judge
United States District Court